IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,　　　　　　　No. 3:20-cr-00050-HZ-1

　　　　　Plaintiff,　　　　　　　　　　　　　OPINION & ORDER

　　v.

JODY TYLER SHELTON,

　　　　　Defendant.

HERNÁNDEZ, District Judge:

　　　　Defendant Jody Tyler Shelton is charged with one count of Possession with Intent to Distribute Heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), and one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moves to suppress the firearm and narcotics seized from him during a traffic stop, as well as statements he made during his arrest. The Court denies Defendant's motion.

# BACKGROUND[1]

Shortly after 5:00 am on January 15, 2020, Salem Police Officer Justin Carney was on patrol in the area of Silverton Road NE and Hadley Street NE, when he saw a dark-colored Jeep Cherokee with its lights on parked facing the wrong direction at the end of the Hadley Street. As Officer Carney drove past the Jeep, he saw that it was occupied, had no front license plate, and had a car dealership placard where a rear license plate would normally be displayed. The Jeep then pulled into an apartment parking lot and the driver got out and headed down the stairwell out of sight. Officer Carney knew from prior drug investigations, surveillance operations, and a recent complaint that known drug traffickers resided in two of the four apartment units in the building. Officer Carney parked nearby to conduct surveillance and wait for the Jeep to leave.

After approximately 10 minutes, the driver exited the apartment building, returned to the Jeep, and started driving eastbound on Silverton Road. Officer Carney followed the Jeep for a few blocks and saw it make a sharp right turn from the first lane crossing over the second lane and into a business parking lot. Officer Carney turned on his overhead lights to conduct a traffic stop based on the unlawful right turn.[2] The driver made a sweeping left turn in the parking lot,

---

[1] The Court held an evidentiary hearing on Defendant's motion to suppress on June 2, 2021. What follows is a summary of the Court's factual findings based on its evaluation of the credibility of the testimony and the probative value of the evidence submitted.

[2] Or. Rev. Stat. § ("O.R.S.") 811.355 provides:

> (1) A person commits the offense of making an improperly executed right turn if the person is operating a vehicle, is intending to turn the vehicle to the right and does not proceed as close as practicable to the right-hand curb or edge of the roadway:
>
>     (a) In making the approach for a right turn; and
>     (b) In making the right turn.
>
> (2) The offense described in this section, improperly executed right turn, is a Class B traffic violation.

turned back toward the roadway, and revved his engine. Officer Carney thought the driver might have been trying to elude him, so he turned his patrol car toward the driver's door and turned on his spotlight. Officer Carney recognized the driver as Defendant Jody Shelton, who he was familiar with from previous drug investigations. The officer also saw that there was a female passenger in the vehicle. Approximately two or three weeks before the traffic stop, a long time, reliable informant told Officer Carney that Defendant was dealing narcotics and carried a firearm.

Officer Carney informed dispatch of the traffic stop and requested a backup officer due to Defendant revving the engine and the informant's report that Defendant was armed. Before exiting his patrol car, Officer Carney ordered Defendant to turn off the Jeep, which he complied with. Officer Carney approached the driver's side window, explained the improper right turn was the reason for the stop, and requested Defendant's license, registration, and proof of insurance. Defendant explained that he had made the abrupt turn because vehicle's rear window had come open causing the interior light to illuminate and he did not want to get into trouble. While remaining at the driver's side window, Officer Carney radioed dispatch to check Defendant for outstanding warrants and driving status. Dispatch reported that Defendant was a valid driver but was on probation for delivery of heroin.

Defendant did not, however, produce a vehicle registration. He explained that he was not the owner of the Jeep and that he was borrowing it from a friend. Defendant struggled to come up with a name at first; he eventually stated that "Cory" owned the Jeep but could not remember Cory's last name. At Officer Carney's suggestion, Defendant looked in the glovebox and located a bill of sale for the Jeep in the name of Cory Crawford. Based on his experience that people involved in drug activity often drive stolen vehicles to avoid detection, the lack of license plates

on the Jeep, and Defendant's inability to provide him with the full name of the Jeep's owner, Officer Carney suspected that the vehicle was stolen.

Typically, Officer Carney would run a vehicle's VIN to determine whether it was reported stolen; however, he did not feel comfortable taking his attention away from Defendant to locate the VIN and, for officer safety reasons, decided to wait for the backup officer to arrive before taking further action to resolve the status of Jeep's ownership. Similarly, Officer Carney also did not begin to write a traffic citation for the unlawful right turn because doing so would have required him to take his attention away from Defendant and the passenger, and he needed to determine the vehicle's registration information to complete the citation anyway. Due to his safety concerns, Officer Carney remained at the driver's side window until his cover officer arrived.

While waiting for backup, Officer Carney saw a bottle of alcohol in the back-passenger seat area of the Jeep. Based on his experience, Officer Carney knew that a prohibition on possessing or consuming alcohol is a standard probation condition for corrections clients who, like Defendant, are on probation for drug-related offenses. When Officer Carney asked Defendant if the terms of his probation prohibited alcohol use, Defendant stated that he was not sure of his conditions because he had not yet met with his probation officer, and that the bottle of alcohol was not his anyway.

Backup arrived approximately three minutes after Officer Carney initiated the traffic stop. Officer Carney stepped away from the driver's window toward the rear of the Jeep to brief the cover officer on the situation. Officer Carney explained to the other officer that he did not believe Defendant was telling the truth about borrowing the Jeep and that he wanted to ask Defendant to exit the vehicle so that he could question Defendant and the female passenger

separately. While he was near the back of the Jeep, Officer Carney also noticed that, on top of lacking front and rear license plates, the Jeep was not displaying a temporary tag in violation of O.R.S. 803.540.

Officer Carney then asked Defendant to exit the Jeep and walk to the rear of the vehicle. When Defendant opened the door, Officer Carney saw a small black bag and what looked like the handle of a large knife on the driver's floorboard. Instead of walking to the rear of the Jeep, Defendant made his way towards the front of the vehicle. Officer Carney instructed Defendant to stop and redirected him towards the rear of the Jeep. He also instructed Defendant to set down his wallet and phone. While walking toward the back of the Jeep, Defendant slowly moved his phone and wallet from his right hand to his left hand and started to drop his right hand to his coat pocket. As he neared the back of the Jeep, Defendant did not slow down, giving Officer Carney the impression that Defendant was not going to stop to talk to him and was trying to create distance between himself and the officer. Based on his observation of the knife in the car, the informant's tip that Defendant was carrying a firearm, and Defendant's behavior after exiting the vehicle, Officer Carney became concerned for his and the cover officer's safety and grabbed Defendant's arm so that he could pat him down for weapons. Before doing so, Officer Carney told Defendant that he was making him nervous and asked if he had any weapons on him. Defendant hesitated before denying he had any weapons, which made Officer Carney even more suspicious that Defendant might be armed.

Officer Carney then directed Defendant to the front of the cover officer's patrol car and instructed Defendant to place his hands behind his back. Defendant complied. Officer Carney first patted down the pocket that he had just observed Defendant reach towards and immediately felt a small-frame revolver in Defendant's pocket. Because he knew Defendant was a felon who

could not legally possess a firearm, Officer Carney placed Defendant in handcuffs and read him his *Miranda* rights. Defendant was placed under arrest about eight minutes after he was stopped.

Before continuing the search of Defendant, Officer Carney asked him if he had anything on him that could harm the officer. Defendant said no, but Officer Carney found an unopened bag of hypodermic needles in his front pocket. Defendant then admitted that he had three heroin-filled needles in his pocket, which Officer Carney recovered. Officer Carney also located several bags containing heroin and methamphetamine in Defendant's chest coat pocket. Officer Carney continued to question Defendant about drug use and drug activity. Defendant made several statements and then requested an attorney. Officer Carney's search of the vehicle revealed additional drug contraband, U.S. currency, and other evidentiary items.

Defendant moves to suppress all evidence seized during the January 15, 2020 encounter, as well as all statements he made during the stop and his arrest. Defendant argues Officer Carney prolonged the traffic stop in violation of the Fourth Amendment by waiting for a backup officer and by shifting the mission of the stop from issuing a traffic ticket to investigating whether Defendant was complying with his probation terms. Def. Mot. 5, ECF 31 ("From the time of the completion of the check for warrants, everything that Officer Carney saw or heard is beyond the scope of the stop and is illegal.").

## STANDARDS

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures by the government. U.S. Const. amend. IV; *Elkins v. United States*, 364 U.S. 206, 213 (1960) (applying Fourth Amendment to states and state actors through Fourteenth Amendment). A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may

be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). A traffic stop is a seizure under the Fourth Amendment. The "tolerable duration" of a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic violation are—or reasonably should have been—completed." *Id.* Such tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as well as "certain negligibly burdensome precautions" related to officer safety. *Id.* at 355-56.

      A police officer may conduct unrelated inquiries during a lawful traffic stop, but "he may not do so in a way that prolongs the stop absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Put differently, "an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion" of other criminal offenses. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion.'" *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)) (emphasis omitted). The officer "must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Terry*, 392 U.S. at 27). When reviewing an officer's reasonable suspicion, the court looks at the "totality of the circumstances." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (citation omitted). Whether the suspicion is reasonable is an objective inquiry. *Whren v. United States*, 517 U.S. 806, 813 (1996).

**DISCUSSION**

Defendant first contends that Officer Carney unreasonably extended the duration of the stop by requesting backup and waiting three minutes for his cover officer to arrive.[3] The government argues that Officer Carney's decision to call and wait for backup was reasonable due to officer safety concerns. The Supreme Court has recognized "that traffic stops are 'especially fraught with danger to police officers.'" *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (per curiam) (recognizing "the inordinate risk confronting an officer" in a traffic stop). Because it is "unreasonable to require that police officers take unnecessary risks in the performance of their duties," *Terry*, 392 U.S. at 23, "officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

Officer Carney called and waited for a cover officer so that he could safely carry out the mission of the traffic stop. He recognized Defendant from previous drug investigations, and he had recently learned from a reliable source that Defendant was dealing narcotics and carrying a firearm. Consistent with that information, Officer Carney watched Defendant make a brief visit to an apartment building known for drug activity. Additionally, Defendant's conduct while being pulled over, i.e., parking the Jeep in a way that allowed for an easy escape and revving the engine, led Officer Carney to sensibly believe that Defendant might try to flee the scene. The situation was also complicated by the presence of the passenger in the Jeep. Given these credible safety concerns, the Court concludes that Officer Carney did not unreasonably extend the traffic

---

[3] Officer Carney credibly testified that he saw Defendant make an improper right turn in violation of O.R.S. 811.355. The Court therefore concludes that the basis for the traffic stop was lawful.

stop by waiting three minutes for his backup to arrive. *See*, *e.g.*, *United States v. Gonzalez*, No. 2:07-CR-083 RCJ-RJJ, 2008 WL 11351432, at *4 (D. Nev. Feb. 20, 2008), *aff'd*, 412 F. App'x 967 (9th Cir. 2011) ("The fifteen to twenty minutes that the Defendant had to wait for police backup was not unreasonable"); *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) (finding officer who requested backup due to the defendant's criminal history did not unreasonably extend traffic stop by waiting twenty-six minutes for backup to arrive); *United States v. Lester*, 477 F. App'x 697, 701 (11th Cir. 2012) (finding five to ten minute delay in the investigation waiting for backup to arrive was reasonable to ensure officer safety); *United States v. Portillo-Saravia*, 379 F. Supp. 3d 600, 613 (S.D. Tex. 2019) (holding "officer safety permitted the roughly seven-minute seizure of Defendants as Officer Cruz awaited backup[.]"). As the Supreme Court has noted, "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Mimms*, 434 U.S. at 111.

Defendant next argues that there was no need for Officer Carney to wait for backup because he had all the information that he needed to write a citation for the moving violation and send Defendant on his way. However, Officer Carney needed the vehicle's registration information to complete the citation. Without a license plate number or a vehicle registration form, which Defendant was unable to provide, Officer Carney required the Jeep's VIN to conduct a database search for the registration information. But locating and writing down the VIN would have required Officer Carney to take his attention away from Defendant and the passenger, thereby exposing himself to potential danger. And even if Officer Carney did have everything he needed to issue the citation, writing the ticket itself would have also required him to take his eyes off of Defendant and the passenger. As discussed, Officer Carney's safety concerns were justified under the circumstances. Because Officer Carney had to wait for his

9 – OPINION & ORDER

cover officer before he could even finish addressing the improper right turn that warranted the traffic stop, he did not exceed the tolerable duration of the stop.

Furthermore, Officer Carney had a reasonable suspicion that Defendant was committing criminal offenses independent of the traffic violation. Almost from the outset of the traffic stop, Officer Carney had reason to suspect that Defendant was driving a stolen vehicle. The Jeep had no license plates or temporary permits displayed. Defendant struggled to come up with the name of the friend who loaned him the Jeep; when he eventually gave a name, he did not know Cory's last name. While Defendant produced a bill of sale for the vehicle in Cory's name, he only found that document after Officer Carney suggested he look in the glovebox. Thus, Officer Carney had ample reasons to suspect that Defendant was not borrowing the Jeep from a friend. Moreover, Officer Carney knew that Defendant had a history of drug trafficking crimes, learned from a reliable informant that Defendant was dealing drugs, and observed Defendant make a brief visit to an apartment building known for drug activity; all of which suggested that Defendant was trafficking drugs. Officer Carney knew from his training and experience that drug traffickers commonly use stolen vehicles to carry out their crimes.

Based on the totality of the circumstances, Officer Carney had knowledge of specific, articulable facts to support a reasonable suspicion that the Jeep was stolen. Considering the safety concerns already discussed, Officer Carney was justified in waiting for backup so he could separately question Defendant and the passenger about how Defendant acquired the vehicle. *See United States v. Williams*, 419 F.3d 1029, 1034 (9th Cir. 2005) (recognizing the danger of "splitting the officer's attention between two or more individuals, and enabling the driver and/or the passenger(s) to take advantage of a distracted officer"); *Ruvalcaba v. Los Angeles*, 64 F.3d 1323, 1327 (9th Cir. 1995) (noting "it may be more dangerous to have the driver outside the

vehicle while one or more other passengers are left inside . . . making it difficult, if not impossible, for the officer to keep a close watch on these passengers").

In addition, Officer Carney also reasonably suspected that Defendant was violating the conditions of his probation. Unlike the officers in *Mati* and *Ward*, who extended the duration of the traffic stop by asking the defendants whether they were on probation, Officer Carney learned that Defendant was on probation from dispatch's report on the results of Defendant's license and background check. *United States v. Mati*, 466 F. Supp. 3d 1046, 1058 (N.D. Cal. 2020); *United States v. Ward*, No. 16-CR-00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal. May 1, 2017). Officer Carney then observed a bottle of alcohol in the back seat of the Jeep. Based on his experience, Officer Carney knew that people on probation for drug crimes, like Defendant, are typically not allowed to possess or consume alcohol as a condition of their probation. On these facts, the Court finds Officer Carney reasonably suspected that Defendant's possession of an alcohol bottle was a probation violation—an arrestable offense under Oregon law. *See* O.R.S. 137.545(2) (a "police officer . . . may arrest a probationer without a warrant for violating any condition of probation[.]"). Officer Carney questioning Defendant about the potential probation violation—which occurred during the time that Officer Carney was waiting for backup to arrive so that he could safely complete the original mission of the traffic stop and further investigate whether the Jeep was stolen—did not impermissibly extend the duration of the stop. *See Rodriguez*, 575 U.S. at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop," so long as the officer does not "do so in a way that prolongs the stop[.]").

On the morning of the hearing, Defendant submitted several cases in support of his suppression motion. In *United States v. Jones*, two officers conducted a traffic stop on the

defendants for making an unsafe lane change. 438 F. Supp. 3d 1039, 1051 (N.D. Cal. 2020). The court determined that the officers impermissibly prolonged the traffic stop by calling and waiting for backup, questioning the defendants about why they were in a hotel parking lot and whether there was any contraband in the vehicle, asking for the passenger's identification, running "ex-felon records checks" on the defendants, removing the driver from the car, and searching the vehicle. *Id.* at 1052. The officers never mentioned the alleged traffic violation to the defendants and instead "immediately began to question [the defendants] about matters unrelated to the alleged traffic violation." *Id.* The court also found that the officers lacked independent reasonable suspicion to prolong the stop because: (1) the smell of unburned cannabis was not a valid basis to believe the car contained contraband after California decriminalized the possession of cannabis, and (2) the unsafe lane change which justified the traffic stop was not, in and of itself, a particularized basis for believing that the defendants had engaged in other criminal conduct. *Id.* at 1054, 1057.

In *United States v. Jackson*, 321 F. Supp. 3d 1223, 1226 (D. Or. 2018), the officer pulled the defendant over for speeding, and asked the defendant for his driver's license and proof of insurance. The officer testified that as the defendant was searching for his identification in the center console, he saw a cylindrical object with black tape wrapped around it that the officer believed to be a weapon. *Id.* The defendant told the officer that he could not locate his identification and identified himself as "Richard Jackson." *Id.* The officer had never met the defendant before but knew the name "Richard Cody Jackson" from contacts and police briefings. *Id.* The officer knew from those contacts that Richard Cody Jackson was involved in drug and weapons trafficking. *Id.* at 1226-27. One minute into the stop, the officer ordered the defendant out of the vehicle and placed him in handcuffs for failing to "carry and present" a driver's

license. *Id.* at 1227. The officer did not ask for the defendant's date of birth, for other identifying information, or call dispatch to ask if Richard Jackson or Richard Cody Jackson had a valid driver's license. *Id.*

At about three minutes into the stop, the officer launched into a series of statements telling the defendant that he knew who he was and what he did and that he had a drug dog in his patrol car. *Id.* The officer asked the defendant if he had a "little dope on him" and then questioned him for about two more minutes about drugs. *Id.* Five minutes into the stop, the officer radioed for back up. *Id.* The officer then asked the defendant again if there was "dope" in the car, which the defendant admitted. Around eight minutes into the stop, the officer asked the defendant for the first time about weapons and conducted a patdown search. *Id.* at 1228. The officer then searched the vehicle and found illicit drugs and contraband. *Id.* One minute later, the officer radioed dispatch to run a license and criminal history check on "Richard Cody Jackson." *Id.* Dispatch reported back that the defendant had a valid driver's license. *Id.*

Judge Aiken determined that the officer impermissibly deviated from the purpose of the stop when he asked the defendant to step out of the car. *Id.* at 1230. The court reasoned that the officer's mere recognition of the defendant's name fell short of a reasonable suspicion to expand the scope of the traffic stop. *Id.* While the officer's observation of what he believed to be a weapon justified ordering the defendant out of the car and performing a patdown search, "[o]fficer safety concerns d[id] not . . . justify [the officer]'s questions about [trafficking] drugs and guns" because "there is no officer safety justification for such questioning." *Id.* at 1230-31. The court also found unpersuasive the officer's assertion that he needed to wait for backup before he could safely return to his vehicle to perform the necessary database searches to verify the defendant's identity. *Id.* at 1231. The officer did not request backup when he initially

13 – OPINION & ORDER

detained the defendant and instead spent several minutes questioning the defendant about drug activity. *Id.*[4]

As the Court's summary should make abundantly clear, *Jones* and *Jackson* are not on point. Unlike the officers in those cases, Officer Carney did not abandon the mission of the traffic stop by questioning Defendant about unrelated matters. Rather, he informed Defendant of the reason for the stop and asked him for his driver's license, proof of insurance, and registration so that he could perform the usual "tasks tied to the traffic violation." *Rodriguez*, 575 U.S. at 355-56. Defendant's failure to provide a registration and difficulty remembering the name of his supposed friend who loaned him the Jeep gave Officer Carney an independent reasonable suspicion to expand the scope of his investigation while waiting for his cover officer to arrive. Although *Jones* noted that calling and waiting for backup was one of several actions that impermissibly prolonged the stop, there is no indication that the officers requested backup for officer safety reasons or had any basis to suspect the defendants in that case were dangerous. What is more, the officers in *Jones* were not outnumbered by the defendants, they had no prior knowledge about the defendants, and there was no indication that the defendants might try to flee the scene. And, unlike the officer in *Jackson* who, in an attempt to intimidate the defendant, requested backup only after the defendant repeatedly refused to answer his impermissible questions about drugs, Officer Carney immediately called for backup due to Defendant revving the engine and after recognizing Defendant as someone he had recently been told was carrying a

---

[4] Defendant also submitted *United States v. Cole*, 994 F.3d 844 (7th Cir. 2021), in support of his suppression motion. However, the Seventh Circuit just recently voted to rehear the appeal en banc and vacated the panel's opinion. *See United States v. Cole*, No. 20-2105, 2021 WL 2363773 (7th Cir. June 9, 2021).

gun. Thus, Defendant's cases do not support his contention that Officer Carney impermissibly extended the duration or scope of the traffic stop.

Finally, Officer Carney was justified in ordering Defendant out of the Jeep once backup arrived. *Mimms*, 434 U.S. at 111; *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) ("[A] police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle[.]") He was also justified in conducting a patdown search of Defendant. Police officers may lawfully "frisk" or "patdown" search an individual during a traffic stop if the officer reasonably suspects the individual is armed and dangerous. *Johnson*, 555 U.S. at 326-27. Along with the informant's tip that Defendant was carrying a firearm, Officer Carney also saw a large knife in the vehicle when Defendant opened the door. After exiting the Jeep, Defendant failed to comply with Officer Carney's directions, reached for his coat pocket, acted as if he trying to create distance between himself and the officer, and hesitated when Officer Carney asked if he had any weapons on him. On these facts, Officer Carney's patdown search of Defendant was based on a reasonable suspicion that he was armed. Accordingly, the evidence will not be suppressed because it was not seized in violation of the Fourth Amendment.

## CONCLUSION

Defendant's Motion to Suppress [30] is DENIED.

IT IS SO ORDERED.

DATED:_____June 20, 2021\_\_\_\_\_.

*Marco Hernandez*
MARCO A. HERNÁNDEZ
United States District Judge

15 – OPINION & ORDER